Filed 12/28/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALIFORNIA-AMERICAN WATER COMPANY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> MARINA COAST WATER DISTRICT, <br><br> Defendant and Respondent. | A160662 <br><br> (San Francisco County Super. Ct. No. CGC-15-546632) |

Here, the third and fourth appeals in this case, we address two separate appeals by two separate plaintiffs from a summary judgment emanating from two separate summary adjudications against them. The first summary adjudication was based on the two-year statute of limitations, the second on the failure to comply with the claim-filing requirement in the Government Claims Act. The summary adjudications were entered in 2019, seven years after the first lawsuit among the parties was filed—and eight years after the parties spent some six months in formal and informal efforts attempting to resolve the issues between and among them.

Our de novo review leads to the conclusion that both summary adjudications were errors and, therefore, so was the judgment. We thus reverse.

## BACKGROUND[1]

### The Parties and the General Setting

The appeals here involve two separate appellants:  Monterey County Water Resources Agency (Monterey) and California-American Water Company (Cal-Am).  Both appeals have the same respondent:  Marina Coast Water Company (Marina).

Appellant Monterey is an independent public agency created by the Monterey Coast Water Resources Act (MCWRA ) (Water Code, Appendix, Chapter 52), responsible for analyzing water resources in Monterey County. Monterey has a dual governing board structure consisting of the elected Monterey County Board of Supervisors and a Board of Directors appointed by the Board of Supervisors.  The appointed Board is responsible for the actual operation of the agency, approving and executing contracts and formulating recommendations to the Board of Supervisors on matters within the scope of the Supervisors' duties.  It also has final authority on most operational and administrative matters.

Appellant Cal-Am is an investor-owned water utility regulated by the California PUC, providing water to over 100,000 residents on the Monterey Peninsula, including Carmel-by the-Sea, Monterey, Pacific Grove, Seaside,

---

[1] Much of the background is taken from the opinion of Division One of this court in the first appeal in this case:  *California-American Water Co. v. Marina Coast Water District* (2016) 2 Cal.App.5th 748 (*Cal-Am One*).  Other facts are from decision No. 10-12-016 by the Public Utilities Commission (PUC) in proceeding No. 04-09-019.  (See *In the Matter of the Application of California-American Water Company (U210W) for a Certificate of Public Convenience and Necessity to Construct and Operate its Coastal Water Project to Resolve the Long-Term Water Supply Deficit in its Monterey District and to Recover All Present and Future Costs in Connection Therewith in Rates*, 2010 Cal. PUC LEXIS 548 (Dec. 2, 2010).

Del Rey Oaks, and Sand City, as well as various unincorporated areas of Monterey County.

Respondent Marina is a public agency formed in 1960 under the County Water District law to provide water for the City of Marina and neighboring communities on the Monterey Peninsula.

A fourth entity involved, though not a party in either appeal, is RMC Water and Environment (RMC).

For many years, an adequate and sustainable source of potable water was a problem on the Monterey Peninsula. And in 1995 the State Water Resources Control Board (SWRCB) issued an Order (No. WR 95-10) to Cal-Am to stop drawing water from the Carmel River and develop an alternate water supply. The Order led to years of discussions, and culminated in late 2009 when Marina, Monterey, and Cal-Am reached agreement on a plan to develop and construct a regional desalinization project designed to extract brackish water from beneath Monterey Bay, purify it, and deliver it to consumers ("RDP" or "the project").

The project was to replace the Carmel River as a water supply, and in furtherance of the project, the parties entered into five interrelated agreements that came to be referred to as the RDP Agreements, specifically:

(1)     A "Reimbursement Agreement," entered into in February and March 2010, under which Cal-Am agreed to reimburse Marina and Monterey their costs in pursuing the RDP, subject to later repayments or forgiveness.

(2)     A "Water Purchase Agreement" (WPA), entered into on April 6, 2010, which provided for the financing and construction of the various facilities.

(3)     A "Settlement Agreement," also entered into on April 6, which established a process for proposing the desalination project to the PUC for approval.

(4)     A "Project Management Agreement," entered into on January 11, 2011, under which RMC was selected as the project manager; and

(5)     A "Credit-Line Agreement," also entered into on January 11, which established a line of credit to Monterey and Marina to minimize their project-related finances.

Meanwhile, while some of the above agreements were still being negotiated and executed, in December 2010, the PUC approved the project, (*Cal-Am One, supra*, 2 Cal.App.5th at p. 753), approval that was a condition precedent to it.[2]

Meanwhile, in January 2010, Marina hired Stephen Collins who sought to facilitate approval of the project by the PUC, including by working on the draft WPA. Our colleagues described Collins's involvement in more detail:

"Stephen Collins was a member of Monterey's appointed board of directors when the RDP agreements were being negotiated and, in some cases, entered into. Starting in January 2010, he also was a paid consultant for RMC to advocate for the agreements through a contract he had with Marina. RMC ultimately paid Collins $160,000 for his work. At a February 2011 meeting of Monterey's board of directors, Collins exposed his potential conflict of interest by recusing himself from a vote on the selection of RMC as the manager of the desalination project. Local media began reporting on the possible conflict of interest, and an investigation followed. Collins resigned

_____

[2] The project was never built, and to this day a replacement water supply has not been completed.

from Monterey's board of directors on April 1, 2011." (*Cal-Am One*, *supra*, 2 Cal.App.5th at p. 753.)[3]

On July 7, 2011, Monterey's outside counsel, Kevin O'Brien, sent a letter to Marina and Cal-Am expressing the opinion the RDP Agreements were void as a consequence of Collins's financial interest in the Project. Cal-Am then gave notice the RDP Agreements were terminated.

Marina, Monterey, and Cal-Am thereafter engaged in months of negotiation and mediation in an attempt to resolve the future of the project, efforts that included several mediation sessions at JAMS and with an Administrative Law Judge at the PUC, and various private sessions. These efforts continued, off and on, for several months, finally ending on January 16, 2012 without resolution.

On January 25, Mark Fogelman, Marina's outside counsel, e-mailed the parties noting "[t]he mediation is over" and declaring "the parties should be free to pursue their legal remedies." And in a later e-mail, Mr. Fogelman further represented that Marina had "no objection" to the parties being able to raise in court any and all "issues and legal claims" referred to in the parties' pre-mediation correspondence or other issues "reasonably related" to such issues and claims.

Despite that, uncertainty surrounded the parties' pre-lawsuit discussions: Marina insisted the parties were obligated to comply with the dispute resolution procedure in the WPA; Monterey disagreed, but

_____

[3] In November 2011, the Monterey County District Attorney filed a criminal complaint against Collins, charging him with two felony violations of Government Code section 1090 arising from Marina's and RMC's secret payments to him and multiple felonies for stealing money from his employer. And on March 18, 2014, Collins pleaded "no contest" and was convicted of the felony violation of Government Code section 1090 and grand theft from his employer.

5

nevertheless followed the contractual procedure. Marina then injected more uncertainty into the setting by refusing to agree that the parties' efforts were in fact compliant with the terms of the WPA, noting, for example, that "[W]hile it is true that representatives of the parties met on July 13, 2011, in a non-confidential meeting, [Marina] does not admit that the July 13, 2011, meeting was conducted pursuant to Article 19 of the WPA or that it constituted an 'attempt in good faith to resolve the dispute.' "

In light of this uncertainty, on September 18, 2012, Cal-Am submitted a claim "pursuant to the California Government Claims Act, Government Code sections 810 et seq" (Claims Act). It was four-pages in length, single-spaced, and in it Cal-Am alleged that the SWRCB had ordered it to come up with an alternative to the Carmel River as a source of water for the Monterey Peninsula. The RDP was that alternative and, Cal-Am alleged, Marina was responsible for causing the project's failure, thereby forcing Cal-Am "to apply to the CPUC for authority to pursue another water supply project. . . ." In short, the claim was based on harm incurred from the RDP's collapse, caused by Marina.

With respect to the specific cause of the project's collapse, the claim alleged Marina failed to obtain financing for its portion of the project. However, the claim also asserted that Marina had taken the position that the RDP's implementing agreements "were void pursuant to Government Code section 1090[4] due to the conduct of a former MCWRA director," Collins. The claim identified, by date, the letters in which Marina took that position. And it further alleged that Marina's actions led to Monterey's assertion that the RDP agreements are void under Government Code section 1090, which led to the termination of the RDP agreements.

---

[4] All undesignated statutory references are to the Government Code.

6

Cal-Am filed then a lawsuit.

**The Lawsuit and the Appeals**

On October 4, 2012, Cal-Am filed a complaint naming as defendants Marina and Monterey. It alleged two causes of action, both for declaratory relief: the first, whether the RDP Agreements were void as a consequence of Marina's payments to Collins; the second, whether Cal-Am had the right to terminate the Agreements regardless of any conflict of interest, as a result of Monterey's anticipatory repudiation. (*Cal-Am One*, *supra*, 2 Cal.App.5th at p. 753.)

On November 19, Marina filed an answer. Marina also filed a cross-complaint against Cal-Am and Monterey seeking a declaration barring any challenges to the RDP Agreements. The cross-complaint alleged seven causes of action, three of which were based on the statute of limitations and four of which were based on the Public Utilities Code. (*Cal-Am One*, *supra*, 2 Cal.App.5th at pp. 754–754.)

At an April 2013 case management conference, the court ordered the action bifurcated into two phases: Phase One would involve resolution of (a) Cal-Am's first cause of action, whether the RDP Agreements were void, and (b) Marina's cross-complaint. Phase Two would deal with any damage claims.

On April 16, 2014, Monterey filed a cross-complaint of its own, alleging a single claim for declaratory relief that the RDP Agreements were void as a result of the payments Collins had received in violation of Government Code section 1090. (*Cal-Am One*, *supra*, 2 Cal.App.5th at p. 756.) This cross-complaint was included in Phase One.

Phase One was tried in early December 2014, a four-day bench trial, following which the trial court issued its statement of decision finding the

7

payments Collins received from Marina and RMC had given him a financial interest in the RDP Agreements in violation of Government Code section 1090. And the court found four of the five RDP Agreements (all but the Credit Line Agreement) void. Judgment was entered in favor of Monterey and Cal-Am. Marina appealed, and Division One of this court affirmed. That was *Cal-Am One.*

The trial court also issued post-judgment orders awarding Monterey and Cal-Am costs and attorney fees as prevailing parties pursuant to the terms of the WPA. As pertinent to an issue here, despite having declared the WPA void, the court applied the attorney fee provision in it. Marina appealed these orders as well, which Division One also affirmed, in *California-American Water Company v. Marina Coast Water District* (2017) 18 Cal.App.5th 571. That was *Cal-Am Two.*

**The Post-Appeal Lawsuits**

On July 1, 2015, Cal-Am and Monterey jointly filed a complaint naming two defendants, Marina and RMC. It was followed shortly by a first amended complaint alleging nine causes of action, for: intentional interference with prospective economic relations; negligent interference with prospective economic relations; concealment; breach of contract; accounting and return; money lent; unjust enrichment; unfair competition law; and False Claims Act.

On July 30, Marina filed its own complaint, naming as defendants Cal-Am and Monterey. It alleged five causes of action, for: breach of warranties and representations; breach of contract; promissory estoppel; unjust enrichment; and violation of law or PUC orders.

On December 9, 2016, Cal-Am and Monterey filed a second amended complaint, adding a new second cause of action, for negligence. There were

8

now 10 causes of action pled, two of which, the first and the tenth, were against only RMC, not Marina. Of the other eight causes of action, only three are pertinent to the issues on appeal: the second, for negligence, and the third and fourth, for interference. And it is these causes of action that are the focus of this opinion.

Marina filed a demurrer, and by order entered February 14, 2017, the trial court sustained it in part and overruled in part, holding that the negligence claim lacked a statutory basis.

Cal-Am and Monterey filed a third amended complaint, alleging vicarious liability under Government Code sections 815.2 and 815.4. Marina challenged the third amended complaint by a motion for judgment on the pleadings. Among other things, Marina argued—for the first time—that the causes of action were barred because Cal-Am's claim was deficient. By order dated February 5, 2018, the court agreed. And despite that this was the first time Marina had alleged this defect, the court denied Cal-Am's request for leave to amend to plead it was not obligated to comply with the Claims Act, giving two reasons: (1) the WPA could not provide an alternative to the claim presentation requirement because it was void from inception;[5] and (2) Cal-Am's reference to a confidential Mediation Agreement was made for the first time at oral argument and the Mediation Agreement appeared to have been pursuant to the void WPA.

Cal-Am sought writ review. We issued an alternative writ of mandate directing the court to vacate the portion of its order denying Cal-Am leave to amend or to show cause why a peremptory writ of mandate should not be

---

[5] This reason for the ruling is quizzical. As noted, in *Cal-Am Two*, *supra*, 18 Cal.App.5th 571, the trial court—the same trial court as here—made an award of attorney fees based on the agreement that court had earlier declared void.

9

granted. The court responded by vacating its order insofar as Cal-Am was denied leave to amend, and the writ petition was dismissed as moot.

Cal-Am and Monterey filed a fourth amended complaint, alleging among other things that the WPA and the Mediation Agreement set forth alternatives to the Claims Act.

Marina filed a demurrer to the fourth amended complaint. The court overruled it, as barred by Code of Civil Procedure section 430.41, subdivision (b).

Cal-Am and Monterey filed a fifth amended complaint that among other things realleged alternative claims procedures under the WPA and the Mediation Agreement. It also alleged that by entering into the WPA, Marina had waived its right under the Claims Act.

Marina filed another motion for judgment on the pleadings against Cal-Am, based on the claimed failure to comply with the Claims Act. The motion argued that the tort causes of action failed to comply with the Claims Act, and that neither the WPA nor the Mediation Agreement excused Cal-Am's failure to comply with the Act.

Cal-Am filed opposition and following Marina's reply and oral argument, the court entered its order granting the motion with leave to amend. The court first upheld its prior ruling that the tort causes of action failed to comply. The court next concluded that Marina could not have waived its rights under the Claims Act by entering into the WPA because it was void from inception. Finally, the court concluded that the Mediation Agreement could not supply a claims procedure for alleged torts that existed when the agreement was entered into; that the Mediation Agreement failed to supply a claims procedure that superseded the Claims Act; and that in any event Cal-Am failed to comply with the procedure in the Mediation

10

Agreement. The trial court nevertheless granted leave to plead waiver or estoppel based on the Mediation Agreement, the Credit Line Agreement, or Marina's "broader course of conduct."

Cal-Am and Monterey filed their sixth amended complaint. It was 24 pages long, containing 113 paragraphs. And as to the negligence cause of action, after incorporating the prior 63 paragraphs, it alleged as follows:

"65. The RDP was a massive, multi-million dollar project and entailed a substantial investment of time, energy, and money on the part of Cal-Am and Monterey. Accordingly, Marina and RMC owed a duty of care to Cal-Am and Monterey to, among other things, refrain from taking any action that posed a risk to the project's completion and fully and truthfully disclose any facts within their knowledge that created risk to the project, including the conflict of interest created by Collins'[s] work on the RDP agreements. In particular, RMC had a duty to ensure that any retention of consultants by them in connection with the RDP complied with applicable laws, including section 1090 of the Government Code. In addition, all employees and independent contractors of Marina owed Cal-Am and Monterey the same duties described above.

"66. One of Marina's employees, i.e., Marina's former General Manager Jim Heitzman, breached the foregoing duties by, among other things, retaining Collins to work on the RDP, arranging for Collins to be paid some $160,000 by RMC for his work, and failing to properly supervise the scope of Collins'[s] work—even though he knew, or reasonably should have known, that Collins'[s] role constituted an illegal conflict of interest. Heitzman's negligent misconduct with respect to the hiring, payment, and supervision of Collins fell within the scope of his employment as Marina's General Manager. Heitzman's negligent misconduct played a vital role in

11

precipitating Collins'[s] violation of section 1090 of the Government Code—which posed a risk to the entire project. Pursuant to Government Code section 815.2(a), Marina is vicariously liable for Heitzman's negligence.

"67. Monterey is informed and believes and on that basis alleges that employees of Marina other than Heitzman whose identities are as yet unknown also breached the foregoing duties, and Monterey reserves the right, pending further discovery, to hold Marina vicariously liable for such misconduct too.

"68. Further, Marina is also vicariously liable for any torts committed by its independent contractors pursuant to Government Code section 815.4. In or about January/February 2010, at least three independent contractors were performing services for Marina relating to the RDP, i.e., RMC, Lyndel Melton (an executive at RMC), and Collins. RMC and Melton breached their duty of care by, among other things, retaining Collins to work on the RDP, arranging for Collins to be paid some $160,000 for his work, and failing to properly supervise the scope of Collins'[s] work. Collins breached his duty of care by performing consulting work that constituted an illegal conflict of interest in violation of Government Code section 1090. Marina is vicariously liable for the negligence of its independent contractors."

The sixth amended complaint also included a new theory that the Credit Line Agreement contained an alternative dispute resolution procedure that superseded the Claims Act; that certain actions and statements of Marina's counsel waived Marina's rights under the Claims Act; and that Marina's conduct estopped it from requiring compliance with the Claims Act.

Marina again sought judgment on the pleadings against Cal-Am reasserting its earlier arguments and also challenging Cal-Am's new waiver and estoppel theories. By order dated February 22, 2019, the trial court

12

adopted its earlier rulings, but nevertheless found that waiver and estoppel had been sufficiently pled.

**The Motions For Summary Judgment/Summary Adjudication**

On December 7, 2018, Marina filed a motion for summary judgment or, in the alternative, summary adjudication, as against Monterey, arguing, as relevant here, that the negligence cause of action was barred by the two-year statute of limitations in Code of Civil Procedure section 339, subdivision (1). The motion was scheduled for hearing on February 20, 2019. And quite a motion it was.

The motion began with the notice of motion, the memorandum of points and authorities, and a declaration of attorney Kyle Brochard, which combined totaled 41 pages. There was also a 31-page separate statement. And then there was a request for judicial notice, of 37 exhibits, totaling 922 more pages.

On February 6, 2019, Monterey filed its opposition, which included among other things its own request for judicial notice of 21 exhibits. The opposition totaled 618 pages.

On February 15, Marina filed its reply, including objections to evidence.

So, what was before the trial court was over 1500 pages of material, a trial court that was new to the case, it having been reassigned effective January 2, 2019.

Marina's motion came on for hearing as scheduled. And on February 22, the trial court filed its 26-page order granting the motion, going on at length in its effort to justify its holding, an order described in detail below.

A week later, on March 1, Marina filed a motion for summary judgment/summary adjudication against Cal-Am, with moving papers more voluminous than in the motion against Monterey. In addition to the

13

memorandum and a 25-page separate statement, there were eight declarations, one of which had 18 exhibits, totaling 580 pages, and a request for judicial notice for 65 exhibits, totaling 749 more pages—almost 1400 pages of material.

On May 15, Cal-Am filed its opposition, totaling over 300 pages. And on May 24, Marina filed its reply, totaling 135 pages.[6]

To prevail on any cause of action subject to the claim-presentation requirement, a plaintiff must demonstrate it either substantially complied with that requirement or was excused from compliance. Thus, a claim-presentation requirement constitutes an element of any cause of action subject to the act. (*State of California v. Superior Court* (2004) 32 Cal.4th 1234, 1243.) Marina sought to demonstrate that Cal-Am could not establish that element, either through the substantial compliance doctrine or any of the theories pled, including implied waiver, express waiver, estoppel, or Government Code section 930.2.[7]

With respect to implied waiver, Marina argued that whatever actions Marina took that constituted implied waiver, Cal-Am did not detrimentally

---

[6] In *Nazir v. United Airlines* (2009) 178 Cal.App.4th 243, 253 (*Nazir*), we quoted from an article co-authored by an experienced Superior Court judge describing the problems he had " 'encountered' " in connection with summary judgment motions, at the very top of which are motions " 'that attempt to "hide" triable issues of material fact.' (Brenner & March, *Use and Abuse of MSJs: A View From the Bench* (2007) 49 Orange County Law, 34, 37, boldface omitted.)" And, we added, the 1,056-page motion with the pages it generated "may well be the most oppressive motion ever presented to a superior court." (*Nazir, supra*, 178 Cal.App.4th at p. 248.)

[7] As pertinent here, Government Code section 930.2 allows local public entities like Marina to include in their contracts a procedural alternative to the statutory process.

rely on those actions, because it did submit a claim. Cal-Am responded by pointing out that reliance is not an element of waiver.

As to express waiver, Marina submitted 33 months of its meeting minutes (from January 2010 through September 2012) and declarations of two past or present General Managers (James Heitzman and Keith Van Der Maaten), and Mr. Fogelman, the attorney Cal-Am contended made the statements constituting express waiver. Marina argued that only its Board had the authority to waive any obligation to submit a claim; that the Board acts only through passage of ordinance, resolution, or motion; and that the Board never took such "formal action" expressly waiving Cal-Am's obligation. Moreover, Marina added, the Board did not specifically authorize any agent, including Mr. Fogelman, to waive its right to receive a claim. Thus, to the extent Mr. Fogelman "purported to waive a right on behalf of Marina, it does not amount to an express waiver because the individual did not have the authority to take that action."

In opposition, Cal-Am submitted the engagement agreement between Marina and its counsel and numerous letters and e-mails, including e-mails from attorney Fogelman containing the statements constituting the express waiver. Cal-Am argued that Marina, like any entity, acts through agents, including outside counsel, and Marina's engagement of counsel constituted a general delegation of authority to negotiate with Cal-Am, which included the authority to waive Marina's procedural right to notice under the Act.

With respect to section 930.4, Marina argued that the WPA's procedure could not supplant the statutory procedure because the WPA was declared void. Cal-Am responded that the void status of the WPA was irrelevant, that what mattered was the fact that Marina entered into a contract containing an alternative procedure, and the parties complied with it.

15

As to the Mediation Agreement, Marina argued that it likewise did not supplant the statutory procedure because the tort causes of action were based on Collins's actions in 2010, which pre-dated the formation of the Agreement, and that claims arising before a contract's formation could not, as a matter of law, meet the "arising out of or related to" limitation in Government Code section 930.2.

Finally, with respect to substantial compliance, Marina argued Cal-Am's claim did not disclose the factual circumstances giving rise to the tort causes of action, i.e., Marina's "hiring and supervision" of Collins.

Hearing on the motion was held on May 29, prior to which the trial court issued a tentative ruling denying the motion. The tentative ruling observed that Marina failed to meet its initial burden on the express waiver issue because its evidence of Board votes was limited to January 2010 to September 2012, noting that "the record is silent as to whether Marina's Board of Directors delegated authority . . . to waive compliance with the act, to any employees or agents . . . in the time period before January 2010."

Following argument, on June 20, the trial court filed its order granting the motion, this one, 26 pages long, also described in detail below. The only explanation provided for the court's change-of-heart was the following statement: "During oral argument, Marina clarified that the Board could not have waived Cal-Am's compliance earlier than January 2010 because no claims had accrued. In other words, there can be no waiver of a right until the Board of Directors knew Cal-Am had a tort claim, which did not arise until after January 2010." Nothing was cited to support that statement.

Cal-Am filed a petition in this court to reverse the order immediately, before the parties proceeded to trial on the remaining claims, to prevent the possibility of having to conduct a duplicative, second trial in the event this

16

court reversed the order in an appeal from the final judgment. (*California-American Water Company v. Superior Court for the City and County of San Francisco*, A157849.) We denied the petition.

On January 22, 2020, trial began on the remaining damage claims by Monterey and Cal-Am against Marina and RMC. A jury was empaneled, but on January 27, before testimony began, the parties entered into a settlement agreement under which all claims against RMC were settled, as were some of Cal-Am's claims against Marina. The settlement agreement expressly preserved Monterey's and Cal-Am's right to appeal the judgment based on the summary adjudication orders.

Judgment in accordance with the settlement agreement was entered on June 9. And on July 10, Monterey and Cal-Am filed notices of appeal.

## DISCUSSION

### The Law of Summary Judgment/Summary Adjudication

"A party may move for summary judgment in an action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a)(1).) "A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, . . . . A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (*Id.*, § 437c, subd. (f)(1).) In short, to prevail, a defendant must show that one or more elements of the challenged cause of action cannot be established or that there is a complete defense to it. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849 (*Aguilar*).)

17

Our review is under well-settled principles, as we confirmed in *Nazir*: "On appeal '[w]e review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law. [Citations.]' (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) Put another way, we exercise our independent judgment, and decide whether undisputed facts have been established that negate plaintiff's claims. (*Romano v. Rockwell Internat., Inc.* [(1996)]14 Cal.4th [479,] 487.) As we put it in *Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320: '[W]e exercise an independent review to determine if the defendant moving for summary judgment met its burden of establishing a complete defense or of negating each of the plaintiff's theories and establishing that the action was without merit.' (Accord, *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.)

"But other principles guide us as well, including that '[w]e accept as true the facts . . . in the evidence of the party opposing summary judgment and the reasonable inferences that can be drawn from them.' (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.) And we must ' "view the evidence in the light most favorable to plaintiff[] as the losing part[y]" and "liberally construe plaintiff['s] evidentiary submissions and strictly scrutinize defendant['s] own evidence, in order to resolve any evidentiary doubts or ambiguities in plaintiff['s] favor." ' (*McDonald v. Antelope Valley Community College Dist*. (2008) 45 Cal.4th 88, 96–97.)" (*Nazir, supra,* 178 Cal.App.4th at pp. 253–254.)

Against that background, we turn to the two appeals before us, beginning with that of the first-named appellant, Cal-Am.

**Cal-Am's Appeal Has Merit:  The Summary Adjudication Was Error**

**The Law of Government Claims**

Government Code section 945.4 provides that "no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented in accordance with . . . section 910 . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board . . . ."  And the referenced section 910 requires that the claim state the "date, place, and other circumstances of the occurrence or transaction which gave rise to the claim asserted" and provides "[a] general description of the . . . injury, damage or loss incurred so far as it may be known at the time of presentation of the claim."

The public policies underlying the claims presentation requirement include that the claim affords the entity an opportunity to promptly remedy the condition giving rise to the inquiry, thus minimizing the risk of similar harm to others, and permits the entity to investigate while tangible evidence is still available, memories are fresh, and witnesses can be located.  The requirement also permits early assessment by the public entity, allows its governing board to settle meritorious disputes without incurring the added cost of litigation, and gives it time to engage in appropriate budgetary planning.  (See generally *DiCampli-Mintz v. County of Santa Clara* (2012) 55 Cal.4th 983, 991; *City of Stockton v. Superior Court* (2007) 42 Cal.4th 730, 738; *Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1234 [summarizing policy considerations].)

Our Supreme Court expounded on the purposes of the law in *Stockett v. Association of California Water Agencies Joint Powers Ins. Authority* (2004) 34 Cal.4th 441, 446 (*Stockett*):  "The purpose of these statutes is 'to provide

19

the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.' (*City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 455.) Consequently, a claim need not contain the detail and specificity required of a pleading, but need only 'fairly describe what [the] entity is alleged to have done.' (*Shoemaker v. Myers* (1992) 2 Cal.App.4th 1407, 1426; *Turner v. State of California* (1991) 232 Cal.App.3d 883, 888.) As the purpose of the claim is to give the government entity notice sufficient for it to investigate and evaluate the claim, not to eliminate meritorious actions (*Blair v. Superior Court* (1990) 218 Cal.App.3d 221, 225), the claims statute 'should not be applied to snare the unwary where its purpose has been satisfied' (*Elias v. San Bernardino County Flood Control Dist.* (1977) 68 Cal.App.3d 70, 74.)"

On the next page the Court elaborated, noting that "The claim, however, need not specify each particular act or omission later proven to have caused the injury. (*Blair v. Superior Court, supra*, 218 Cal.App.3d at p. 225.) A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an 'entirely different set of facts.' (*Stevenson v. San Francisco Housing Authority* (1994) 24 Cal.App.4th 269, 278.) Only where there has been a 'complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim,' have courts generally found the complaint barred. (*Blair v. Superior Court, supra*, at p. 226.) Where the complaint merely elaborates or adds further detail to a claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint.

(*White v. Superior Court* (1990) 225 Cal.App.3d 1505, 1510–1511." (*Stockett, supra*, 34 Cal.4th at p. 447.)

Applying these, and other principles, our de novo review leads to the conclusion that the trial court erred in granting summary adjudication against Cal-Am. There are several reasons why, beginning with the fact the trial court erred in applying the law of waiver.

**Implied Waiver**

As noted, Cal-Am pled various theories excusing compliance with the Claims Act, one of which was implied waiver. As also noted, Marina argued there could not be a waiver unless Cal-Am showed detrimental reliance, that is, unless Marina's actions caused Cal-Am to not submit a claim. And since Cal-Am did submit a claim, there was no reliance. The trial court agreed.

The court first recognized that Cal-Am "relies on a handful of cases," going on to list five. Never taking issue with, or distinguishing, any of the five cases, the trial court made this one-paragraph conclusion:

"The question here is narrow—whether a plaintiff can show that a public entity impliedly waived compliance with the Government Claims Act without demonstrating reliance. Estoppel and waiver doctrines have been read into the Government Claims Act to prevent public entities from using the claims statues as traps for the unwary. (*Hill v. Newkirk* (1994) 26 Cal.App.4th 1047, 1059.) The Court is not aware of cases finding an implied waiver of the claim requirement in the absence of reliance in the form of a failure to submit a timely claim. (Compare *Castaneda v. Department of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1064; *City of Stockton v. Superior Court*[, *supra*,] 42 Cal.4th [at pp.] 743–746 [rejecting estoppel argument because conduct could not have deterred plaintiff from presenting a claim after the defendants failed to keep their promises;

21

rejecting waiver argument that was raised based only on a ground found in the statute itself].)  Cal-Am has not directed the Court to any such authority. Accordingly, the Court concludes that Cal-Am cannot prevail on an implied waiver argument because it submitted a timely claim."

This was wrong.

Waiver means "the intentional relinquishment or abandonment of a known right."  (*Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1048 (*Bickel*), superseded by statute on another ground as noted in *DeBerard Properties, Ltd. v. Lim* (1999) 20 Cal.4th 659, 668; see *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 (*Waller*).)  And whether there has been waiver is a question of fact.  (*Bickel*, *supra*, 16 Cal.4th at p. 1052.)  Waiver " 'always rests upon intent.' "  (*City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107.)  The intention may be express, based on the waiving party's words, or implied, based on conduct that is " 'so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.' "  (*Savaglio v. Wal-Mart Stores, Inc.* (2007) 149 Cal.App.4th 588, 598; see *Waller*, *supra*, 11 Cal.4th at pp. 31, 33–34.)

As numerous cases have held, "Waiver differs from estoppel, which generally requires a showing that a party's words or acts have induced detrimental reliance by the opposing party."  (*Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, 475–476; *Rubin v. Los Angeles Federal Savings & Loan Assn.* (1984) 159 Cal.App.3d 292, 298 ["detrimental reliance is not a necessary element of waiver, only of estoppel"]; *City of Hollister v. Monterey Ins. Co.* (2008) 165 Cal.App.4th 455, 487 [same]; *DuBeck v. California Physicians' Service* (2015) 234 Cal.App.4th 1254, 1265 [" ' "The party who has the right may waive it without reliance by another" ' "].)

As Witkin distills it, citing numerous cases and authorities, "Waiver is the intentional relinquishment of a known right. [Citations.] [¶] Technically, therefore, waiver is the affirmative act of one party and does not require an act or conduct by the other party. [Citations.]" (13 Witkin, Summary of California Law (11th ed., Supp. May 2022 update) Equity, § 215, p. 569.)[8]

The cases cited by Marina below, and adopted without analysis by the trial court, provide no support for the court's ruling. *Castaneda v. Department of Corrections & Rehabilitation*, *supra*, 212 Cal.App.4th at pp. 1064–1065 addressed only estoppel, not waiver; and in *City of Stockton v. Superior Court*, *supra*, 42 Cal.4th 730, the Supreme Court analyzed the estoppel and waiver defenses separately, rejecting the estoppel argument for lack of reliance and then rejecting the waiver defense for other reasons, without any mention of reliance. (*Id*. at pp. 744–745.)

For this reason alone, summary adjudication was wrong, as there was a triable issue of fact as to implied waiver. Likewise as to express waiver.

---

[8] In light of all this, we reject Marina's statement that the law of whether reliance is necessary for waiver is "not uniform," as the cases it cites are easily distinguishable. Marina cites, for example, *Applera Corp. v. MP Biomedicals, LLC* (2009) 173 Cal.App.4th 769, 791, which suggested, without analysis, that there can be no waiver unless "it has ripened into an estoppel by reason of prejudice to the adverse party." The only case cited for that proposition, however, is an old insurance coverage case, *McDanels v. General Insurance Co. of America* (1934) 1 Cal.App.2d 454, which, most improperly, used "waiver" and "estoppel" interchangeably. As to this, Witkin is again apt which, citing to *McDanels*, says this: "The doctrine [of waiver] is, however, frequently confused with that of estoppel." (13 Witkin, Summary of California Law, *supra*, Equity, § 215, p. 569.)

**Express Waiver**

Cal-Am also alleged express waiver based on the representations by Marina's attorney Fogelman at the conclusion of the many months devoted to possible resolution of the issues among the parties. Marina did not contend that Mr. Fogelman's statements did not support waiver, but rather argued that as a matter of law only its Board had the power to waive Marina's right to notice under the Claims Act and did not do so. Again, the trial court agreed. This, too, was error. For several reasons.

To begin with, Cal-Am pled detailed facts, including by quoting the statements constituting the waiver, demonstrating that the express waiver argument was predicated on statement made by Marina's attorney—not votes cast by the Board—at the end of the unsuccessful pre-lawsuit dispute resolution process. Marina's focus on the *Board's* actions addressed allegations not pled in the complaint, and thus failed to negate the express allegations pled in the complaint. Thus, summary adjudication was error. (See *Laabs v. Victorville* (2008) 163 Cal.App.4th 1242, 1258 ["It is the allegations in the complaint to which the summary judgment motion must respond"].)

Indeed, Marina addressed the allegations in the complaint only insofar as to dismiss them out of hand as inconsistent with Marina's late in the game—Cal-Am describes it as "made up"—Board-waiver theory. Citing *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538 (*Horsemen's*) and *Burchett v. City of Newport Beach* (1995) 33 Cal.App.4th 1472 (*Burchett*), Marina simply stated: "To the extent an officer or agent purported to waive a right on behalf of Marina, it does not amount to an express waiver because the individual did not have the authority to take that action." The trial court cited both cases. But neither is

pertinent, as they applied a rule limited to public officers. (See *Horsemen's*, *supra*, 4 Cal.App.4th at p. 1564 ["any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted"]; *Burchett*, *supra*, 33 Cal.App.4th at p. 1479.) That rule has no application here, as attorney Fogelman was not a public officer. In short, by failing to negate the express waiver theory as pled, Marina failed to meet its initial burden.

But even assuming Marina had met its initial burden, Cal-Am demonstrated triable issues of fact. Cal-Am based its express waiver theory on representations made by an attorney retained by Marina who was at the time he made them engaging in pre-lawsuit negotiations with Cal-Am as precedent to legal action. And there was a triable issue whether Cal-Am could rely on them.

"As a general proposition, the attorney-client relationship, insofar as it concerns the authority of the attorney to bind his client by agreement or stipulation, is governed by the principles of agency. [Citation.] Hence, 'the client as principal is bound by the acts of the attorney-agent within the scope of his actual authority (express or implied) or his apparent or ostensible authority . . . .' [Citations.] [¶] . . . [¶] An attorney retained to represent a client in litigation is clothed with certain authority by reason of that relationship. 'The attorney is authorized by virtue of his employment to bind the client in procedural matters arising during the course of the action. . . .' [Citation.] [¶] The authority thus conferred upon an attorney is in part apparent authority—i.e., the authority to do that which attorneys are normally authorized to do in the course of litigation manifested by the client's act of hiring an attorney—and in part actual authority implied in law." (*Blanton v. Womancare, Inc.* (1985) 38 Cal.3d 396, 403–404 (*Blanton*).)

25

As Witkin distills the rule, "The attorney's apparent authority covers all the ordinary procedural steps in the prosecution of a legal proceeding, such as pleadings, remedies, trial, etc., and the attorney's actions in these matters will bind the client. [¶] A typical statement of the rule appears in *Redsted v. Weiss* (1945) 71 Cal.App.2d 660: An attorney has 'the general implied or apparent authority to enter into or make such agreements or stipulations, with respect to procedural or remedial matters, as appear, in the progress of the cause, to be necessary or expedient for the advancement of his client's interests or to accomplishment of the purpose for which the attorney was employed.' ([*Redsted v. Weiss*, *supra*,] 71 Cal.App.2d [at p.] 663.)" (1 Witkin, Cal. Procedure (6th ed. 2021) Attorneys, § 263, p. 326.)

Cal-Am's evidence—liberally construed, as it must be—and the reasonable inferences from all that evidence demonstrated a triable issue of fact whether Mr. Fogelman had the authority to waive Marina's right to statutory notice. That evidence included the 2009 Board minutes approving the retention of Mr. Fogelman, and letters, e-mails, and other evidence demonstrating his interactions and negotiations with Cal-Am's attorneys throughout the pre-lawsuit resolution process regarding Cal-Am's potential claims against Marina. A factfinder could reasonably infer that Marina's counsel, who had received abundant information regarding Cal-Am's potential claims, had the apparent authority to waive Marina's statutory right to receive a formal claim. It is reasonable to infer that the attorney put in a position by Marina's Board to negotiate the substance of Cal-Am's potential claims against Marina also had the authority to waive Marina's right merely to receive formal notice of those claims. (See *Blanton*, *supra*, 38 Cal.3d at p. 406 ["apparent authority is created, and its scope defined, by

26

the acts of the principal in placing the agent in such a position that he appears to have the authority which he claims or exercises"].)

Not only that, two Marina Board members (Dan Burns and Ken Nishi) were copied on one of the e-mails sent by Mr. Fogelman in which he made some of the statements on which Cal-Am's express waiver theory was premised. Neither objected to the statements.

The trial court ignored almost all of Cal-Am's evidence and failed to draw all reasonable inferences from other evidence in Cal-Am's favor. The trial court ignored all of the letters, e-mails, and other evidence of Mr. Fogelman's interactions with Cal-Am, distilling Cal-Am's evidentiary showing to essentially one thing—the engagement agreement. The court then determined that the agreement did not constitute any evidence of Mr. Fogelman's authority because it "does not expressly authorize" counsel "to waive compliance" with the Act.

Certainly any such non-authorization was not known to Cal-Am.

In any event, the court's conclusion ran afoul of the principle that a court cannot grant summary judgment based on inferences that are contradicted by other inferences or evidence. And a triable issue of fact exists when the evidence permits a reasonable trier of fact to find a contested fact in favor of the party opposing the motion. (*Aguilar, supra,* 25 Cal.4th at pp. 856–857.) Put slightly differently, a summary judgment may not be granted unless the evidence is *incapable* of supporting a judgment for the losing party. As one court put it, " 'even though it may appear that a trial court took a "reasonable" view of the evidence, a summary judgment cannot properly be affirmed unless a contrary view would be unreasonable as a matter of law in the circumstances presented.' " (*Faust v. California*

27

*Portland Cement Co.* (2007) 150 Cal.App.4th 864, 877, citing *Binder v. Aetna Life Ins. Co.* (1999) 75 Cal.App.4th 832, 838.)

The trial court rejected Cal-Am's express waiver argument, in part, because it believed that accepting Cal-Am's argument would require it "to make the unreasonable inference that each of the declarations of Marina's Board of Directors were [*sic*] crafted to be misleading." Preliminarily, we do not understand the comment about "unreasonable inference," as Marina submitted two declarations, both of which contained the identical—not to mention, narrowly phrased—testimony that the Board did not formally *vote* to either waive Cal-Am's compliance with the Act or grant anyone else that specific power. But an attorney has more authority than what a client specifically authorizes, and the declaration testimony did not address that issue at all, such as by attesting to the limits of the scope of the engagement. Cal-Am's argument therefore suggested nothing more than that the declarants' testimony was incomplete—not misleading.[9]

Finally on this issue, we note another fundamental principle of summary judgment law that was disregarded—that the procedural rules required by statute must be strictly applied. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1607; see generally Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group, 2022) ¶ 10:279, p. 10-139.)

_____

[9] Perhaps more improper in the summary adjudication setting was the trial court's refusal to infer the declarations were "misleading," as it meant the court deemed that testimony to be sufficiently credible to outweigh competing inferences from Cal-Am's evidence. This was wrong. (See *Binder v. Aetna Life Ins. Co.*, *supra*, 75 Cal.App.4th at p. 840 ["The trial court may not weigh the evidence in the manner of a fact finder to determine whose version is more likely true. [Citation.] Nor may the trial court grant summary judgment based on the court's evaluation of credibility"].)

Here, Marina's separate statement violated the so-called "golden rule" of summary judgment, which is this: "[I]f it is not set forth in the separate statement, *it does not exist*." (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 337, superseded by statute on another ground as stated in *Certain Underwriters at Lloyd's of London v. Superior Court* (1997) 56 Cal.App.4th 952, 957, fn. 4; Weil & Brown, Civil Procedure Before Trial, *supra*, ¶ 10:94, p. 10-37.)

"Both the court and the opposing party are entitled to have all the facts upon which the moving party bases its motion plainly set forth *in the separate statement*." (*United Community Church v. Garcin, supra,* 231 Cal.App.3d at p. 337.) And if the separate statement does not contain all material facts on which the motion is based, the moving party has failed to meet its initial burden of production and is "not entitled to summary adjudication as a matter of law." (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1350; *Roger H. Proulx & Co. v. Crest-Liners, Inc.* (2002) 98 Cal.App.4th 182, 201 ["Without facts set forth in a separate statement to support a ground for summary judgment, summary judgment cannot be granted on that ground"].)

Marina's attempt to negate Cal-Am's express waiver theory was based on facts that included that Marina has a Board; that the Board acts by voting to pass a resolution, ordinance, and/or motion; that any actions are recorded in the Board minutes; that from January 2010 to September 2012, its Board did not vote to pass any resolution, ordinance, or motion waiving Cal-Am's obligation to submit a claim; and that the Board did not vote to delegate the authority to waive that obligation to anyone else.

Marina's declarants attested to additional purportedly material facts. Two of Marina's former General Managers attested to facts regarding the

scope of their authority, an essential factual component of Marina's argument that only its Board had authority to waive its rights. Marina's outside counsel Fogelman similarly declared that the Board did not specifically authorize him or "any other agent" to waive Cal-Am's obligation to present a claim during the time period in which he represented Marina.

All of these facts were material to Marina's express waiver argument. Not one of them appears in Marina's separate statement.[10] In short, Marina's separate statement flouted the requirements of Code of Civil Procedure section 437c, subdivision (b)(1). Regardless, the trial court swept this aside, declaring that this "is not a case where the moving party failed to cite evidence in its separate statement," and affirming its "discretion to consider evidence not set forth in the separate statement where the opposing party has had notice of the evidence and an opportunity to respond." This misses the point. The "golden rule" applies to the absence of the fact from the separate statement, "not the underlying evidence supporting the fact." (*Parkview Villas Assn. Inc. v. State Farm Fire & Casualty Co.* (2005) 133 Cal.App.4th 1197, 1214; see *North Coast Business Park v. Nielsen Construction Co.* (1993) 17 Cal.App.4th 22, 31 ["when the 'fact' is not mentioned in the separate statement, it is irrelevant that such fact might be buried in the mound of paperwork filed with the court"].)

---

[10] The only "fact" relevant to the express waiver issue that Marina included in the separate statement was that "Marina did not intentionally waive the right to receive written notice of Cal-Am's tort theories pursuant to the Government Claims Act." But waiver is a legal conclusion made by a factfinder *based* on the facts; it is not a fact itself. (See CACI No. 336.) It does not belong in a separate statement. (See *Masonite Corp. v. Superior Court* (1994) 25 Cal.App.4th 1045, 1050.)

30

In sum, there was a triable issue of fact as to express waiver. And another, as to the applicability of alternatives to the Claims Act.

**The WPA**

As noted, section 930.2 allows local public entities like Marina to include in their contracts a procedural alternative to the statutory process. And if an entity enters into an agreement containing such an alternative procedure, that procedure "exclusively governs. . . ." (§ 930.4.) As we put it in *Arntz Builders v. City of Berkeley* (2008) 166 Cal.App.4th 276, 289 (*Arntz*), "We detect no legislative intent, nor any practical need, to require presentation of a statutory claim after a claimant has complied with a local entity's contractual claims procedure."

Here, the WPA contained a detailed pre-litigation procedure; the parties also entered into the separate Mediation Agreement. And in its complaint, Cal-Am detailed at length—some 29 paragraphs—its efforts to fulfill the requirements of the dispute resolution provisions in those agreements.

As also noted, in 2012, before any lawsuit was filed, Marina took the position that Monterey had to comply with the WPA. But in its motion Marina argued that the dispute resolution procedure in the WPA did not "exclusively govern[]" within the meaning of section 930.4, because the agreement was declared void in *Cal-Am One*. Thus, Marina argued, section 930.4 could not apply because such application "would treat the WPA as in effect." The trial court agreed, but provided no analysis, instead referring to a previous order that had been entered on a motion for judgment on the pleadings and stating it "does not modify the prior legal analysis."

Passing over whether a ruling on a judgment on the pleadings should— or even can—govern determination of a motion for summary adjudication, and the strict scrutiny required, such incorporation by reference was error. A

31

trial court must "state its reasons" for any determination made in a summary judgment order.  (Code Civ. Proc., § 437c, subd. (g); *Santa Barbara Pistachio Ranch v. Chowchilla Water Dist.* (2001) 88 Cal.App.4th 439, 448–449.)  What the court did here did not comply:  the "statement of reasons-by-reference was noncompliant." (*Ruoff v. Harbor Creek Community Assn.* (1992) 10 Cal.App.4th 1624, 1627.)

Highlighting the impropriety of relying on a prior ruling is this observation in *Cal-Am One*:  "Although the court had concluded in its first summary judgment order that California-American's cause of action under Government Code section 1090 was barred by the short statute of limitations governing validation actions, it revisited and rejected this conclusion in the statement of decision."  (*Cal-Am One*, *supra*, 2 Cal.App.5th at p. 757.)  In other words, the trial court there—the same judge who made the earlier ruling here— recognized its earlier decision was wrong, and reversed it.

In any event, the trial court's decision was error.  It is probably enough to note that *Cal-Am Two* affirmed the award of attorney fees based on a provision in the void contract.  The Court of Appeal held "[t]he award of attorney fees did not violate public policy because the trial court's determination that the parties' agreements were void ab initio did not render illegal the subject matter of the agreements, which set forth the parties' relationships and rights in connection with a lawful project, and thus the illegality exception to the rule of mutuality of remedies did not apply." Reaching that conclusion, the court noted among other things that a "determination that the agreements were void ab initio . . ." did not render the agreements illegal.  (*Cal-Am Two*, *supra*, 18 Cal.App.5th at pp. 571, 579.)

In its opening brief here, Cal-Am made a four-part argument regarding why the void ab initio status of the WPA did not retroactively render the

32

dispute resolution procedure in that agreement inapplicable.  Marina chose not to respond to any of Cal-Am's arguments except for the analogy Cal-Am drew to Civil Code section 1717.  And on that issue, Marina offers only a conclusion, not an argument:  "There is no similar statutory purpose negated here by enforcing the Claims Act in the wake of the void WPA claims procedure."  This is inadequate.

The purpose of section 930.4 is to make clear that the statutory claims process does not apply if the parties entered into a contract containing an alternate procedure.  (*Arntz, supra*, 166 Cal.App.4th at p. 290.)  Exempting contracts later declared void ab initio from section 930.4's "exclusive governance" clause—as the trial court did here—negates the purpose of the statute.  The trial court's conclusion would also cause confusion as to which claims procedure governed, undermining the related statutory goal of "eliminating uncertainty in the claims-presentation requirements." (*DiCampli-Mintz v. County of Santa Clara, supra*, 55 Cal.4th at p. 997.)

Finally, in what can only be called an inconsistent position, Marina suggests that "in lieu of submitting a claim," Cal-Am should have provided "notice of alleged tort causes of action" pursuant to the WPA's procedure, which supposedly would have "avoided the consequences" of the WPA's void status.  Yet, according to Marina's own argument, any such notice under the WPA would have been a nullity given the void status of that agreement. Marina cannot have it both ways.

**The Mediation Agreement**

In addition to the WPA, the parties entered into a second agreement with a dispute resolution procedure, i.e., the Mediation Agreement, which Cal-Am contended also applied and was complied with.  In a tortuous, three-page argument, Marina essentially contends that Cal-Am's claims "fall outside the Mediation Agreement's claims procedure," which, it asserts,

33

refers to agreements containing "provisions governing the presentation . . . of any or all claims arising out of or related to the agreement . . . ." (§ 930.2.) According to Marina, the tort causes of action are not such claims because they "arise out of the hiring and supervision of Collins and his violation of Government Code section 1090 in 2010, more than a year before the Mediation Agreement was executed." In other words, Marina construes "claims arising out of or related to the agreement" to have a temporal limitation, including only claims accruing after formation of the agreement.

But section 930.2 refers to claims "related to the agreement. . . ." Cal-Am's tort causes of action are "related to" the Mediation Agreement because it was formed for the purpose of enabling the parties "to negotiate and discuss all RDP-related disputes." And the tort causes of action are premised on these allegations, as detailed in the complaint.

Superimposed on all the above is the fact that, in light of the extensive settlement discussions in 2011 through 2012, all the policy reasons that underlie the claim-filing requirement were met here: opportunity to the entity to promptly remedy the condition giving rise to the inquiry; allowing the entity to investigate while tangible evidence is still available, memories are fresh, and witnesses can be located; and early assessment by the entity, allowing it to settle meritorious disputes without incurring the added cost of litigation.

We close with the observation that the claimed absence of any government claim was such a non-issue for Marina that it actively litigated the tort causes of action for nearly two-and-a-half-years, raising the claim-presentation procedure as a defense for the first time in its December 2017 motion for judgment on the pleadings—a non-issue made more apparent by the fact Marina counter-sued Cal-Am for its own damages stemming from the

34

collapse of the RDP.  (See *People ex rel. Dept. of Parks & Recreation v. West-A-Rama, Inc.* (1973) 35 Cal.App.3d 786, 794 ["Presumably, [the State] has already made the decision that the claim should not be settled, since State itself decided to litigate"].)

**Monterey's Appeal Has Merit:  The Summary Adjudication Was Error**

**Introduction**

Monterey's sixth amended complaint alleged a negligence claim against Marina based on respondeat superior and vicarious liability under sections 815.2 and 815.4, liability under the former section predicated on an employment relationship, under the latter an independent contractor relationship.  In short, Monterey alleged Marina failed to supervise Heitzman, and Heitzman failed to supervise Collins.

Marina's motion for summary adjudication against the claim for negligence was based on the two-year statute of limitations in Code of Civil Procedure section 339, subdivision (1).[11]  The introduction section of Marina's memorandum of points and authorities asserted that Monterey's negligence claim "arises from the Government Code Section 1090 violation committed" by Collins, and that the harm caused by this violation "occurred by April 6, 2010, at the latest, when Monterey entered into the contracts tainted by Collins's violation."  The argument section went on to assert that Monterey's "causes of action accrued no later than April 6, 2010," as "by then, the Reimbursement Agreement, Settlement Agreement, and WPA had been made in violation of section 1090."

---

[11] Marina also moved for summary adjudication of the two interference claims, which the court granted on different grounds.  Monterey does not contest these rulings on appeal.

Following its description—however erroneous—that Monterey's claim is "predicated on Collins's violation of section 1090," Marina's moving papers focused entirely on Collins's conduct, when Monterey supposedly knew about it, and when a cause of action for violation of section 1090 accrued. And Marina's separate statement is focused almost entirely on Collins's violation of section 1090.

Collins's violation of section 1090 was established in Phase One. It is not being litigated again. Marina did not violate section 1090 and Monterey is not suing Marina for violating section 1090. Indeed, as Marina itself writes, it could not have violated section 1090 itself because it is a public agency and not a public official. Monterey is suing Marina for breaching its duty of care to Monterey by negligently supervising its employee Heitzman and its subcontractors RMC and Collins. That claim did not accrue in 2010.

**The Governing Law**

Our Supreme Court distilled the general principles in *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397 (*Norgart*): "Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action. (Code Civ. Proc., § 312; see generally, 3 Witkin, Cal. Procedure, *supra*, Actions, § 459, pp. 580–581.)

"The general rule for defining the accrual of a cause of action sets the date as the time, 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' [Citation.] In other words, it sets the date as the time when the cause of action is complete with all of its elements (see *Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 187 [stating that '[i]n ordinary . . . actions, the statute of limitations . . . begins to run upon the occurrence of the last

36

element essential to the cause of action']; [citation] . . .—the elements being generically referred to by sets of terms such as 'wrongdoing' or 'wrongful conduct,' 'cause' or 'causation,' and 'harm' or 'injury.' [Citations.]

"An exception to the general rule for defining the accrual of a cause of action—indeed, the 'most important' one—is the discovery rule. [Citation.] It may be expressed by the Legislature or implied by the courts. [Citation.] It postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. ([Citation]; see *Neel v. Magana, Olney, Levy, Cathcart & Gelfand, supra*, 6 Cal.3d at p. 179 [postponing accrual 'until the [plaintiff] discovers, or should discover, his cause of action'].)"

The date of accrual of a cause of action is a question of fact. (*Jefferson v. County of Kern* (2002) 98 Cal.App.4th 606, 611.)

Whether a statute of limitations is viewed as "favored" or "disfavored," (*Norgart, supra*, 21 Cal.4th at 396), the competing policies underlying such statutes are well-recognized: "One purpose is to give defendants reasonable repose, thereby protecting parties from 'defending stale claims, where factual obscurity through the loss of time, memory or supporting documentation may present unfair handicaps.' [Citations.] A statute of limitations also stimulates plaintiffs to pursue their claims diligently. [Citations.] A countervailing factor, of course, is the policy favoring disposition of cases on the merits rather than on procedural grounds. [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*).)

Here, of course, the two policies favoring the defense—guarding against stale claims and diligent pursuit by plaintiff—were present, again because of the extensive negotiations in 2011 through 2012.

37

### The Motion and the Trial Court's Order Did Not Address the Pleading

Marina's motion, and the trial court's order, focused exclusively on Collins's conduct and when Monterey might have learned of it. But Collins's conduct, standing alone, is insufficient to support a negligence claim against Marina under section 815.4 without evidence that Monterey knew he was acting as an independent contractor to Marina. And Collins's role as an independent contractor is only part of the vicarious liability cause of action Monterey pled. The other part deals with the negligence of Marina's employee Heitzman. Monterey's vicarious liability claim against Marina could not accrue unless and until Monterey knew Heitzman, in his capacity as an employee, and Collins, in his capacity as an independent contractor, caused Monterey to suffer harm. And without knowledge of Heitzman's negligence as to Collins, no cause of action under section 815.2 could accrue. In sum, in order for Monterey's negligence claim against Marina to have accrued by April 6, 2010, Monterey needed to know at least two things before that date: first, that it had suffered "harm" as the result of some wrongdoing; and second, that it had a cause of action against Marina for the harm based on conduct by an employee or an independent contractor or both. Marina's motion failed to establish either of these elements.

Marina's motion for summary adjudication was silent on this. Nothing in Marina's motion addressed Marina's conduct or the actual negligence claim Monterey pled against Marina. Indeed, aside from a few references identifying Marina as a public agency and as a party to the RDP, Marina's separate statement contains no references to Marina's operation, its employees, or its representatives. Marina's motion was directed at a claim Monterey had not pled—and was devoid of any facts relevant to the claim it had. Again, summary adjudication was error. (See *Laabs v. Victorville*,

38

*supra*, 163 Cal.App.4th at p. 1258 ["It is the allegations in the complaint to which the summary judgment motion must respond"].)

Much as it did in its decision against Cal-Am, the trial court noted Monterey's position on this, and then dismissed it, with this discussion:

"Monterey argues that the motion should be denied because the notice of motion and the separate statement do not match. [Citation.] Marina replies that (1) the deficiency does not impact Marina's request for summary judgment; and (2) the court has and should exercise discretion to overlook any deficiency in the notice. [Citation.]" Then, after quoting California Rules of Court, rule 3.1350(b) and rule 3.1350(d), the trial court went on:

"Marina points to *Truong v. Glasser* (2009) 181 Cal.App.4th 112, 118. [Citation.] There, the court began by holding that the moving party was not required to separately list issues because the moving party was seeking summary judgment. (*Truong*, 181 Cal.App.4th at [p.] 118.) The court proceeded to state, in the alternative, that even if additional headings had been required, the facts critical to the ruling were adequately identified and the plaintiffs had not identified any defect that impacted their ability to marshal evidence in opposition. (*Ibid.*) Accordingly, the trial court properly exercised its discretion to overlook and infirmity in the document.

"Here, the separate statement is clearly adequate to provide notice of the issues as to: (1) the statute of limitations challenge to the negligence claim; and (2) the challenge to the economic interest element of each of the interference torts. . . ." The court then noted its conclusion: "summary adjudication is granted as to the negligence claim on the basis of the statute of limitations."

There followed a brief recitation of background law, which included this observation: "[r]esolution of the statute of limitations issue is normally a

question of fact. (*Nguyen v. Western Digital Corp.* (2014) 229 Cal.App.4th 1522, 1552; *Stella v. Asset Management Consultants, Inc.* (2017) 8 Cal.App.5th 181, 193.) However, summary judgment is proper if the court can draw only one legitimate inference from uncontradicted evidence about the limitations issue. (*Choi v. Sagemark Consulting* (2017) 18 Cal.App.5th 308, 323–[3]24.)"

The trial court's order then had a section entitled "Marina's Burden" where, under the heading "Accrual," the court recited for some six lines Collins's conduct in 2010. And then the order said this: "Because Collins was financially interested in the Reimbursement Agreement, WPA, and Settlement Agreement—i.e., as a paid consultant on the RDP, Collins could expect, and did receive, additional work as a result of those contracts being approved—at a time when he was a public official, Collins's making of those contracts violated Government Code § 1090 and rendered those contracts void ab initio. [Citation.] The WPA was the principal agreement among Marina, Monterey, and Cal-Am regarding the construction and operation of the RDP. [Citation.] The parties executed the WPA on April 6, 2010, although it was not approved by the California Public Utilities Commission ('PUC') until December 3, 2010. [Citation.] RMC was a consultant to Marina on the RDP for all of 2010. [Citation.]

"These undisputed facts satisfy Marina's initial burden on the wrongdoing element by showing that Marina's wrongdoing occurred by at least the end of April 2010. The wrongdoing preceded the execution of the WPA on April 6, 2010.

"With respect to the causation and harm elements, Marina argues that harm occurred on or before either March 30, 2010 or April 6, 2010, the dates on which the Reimbursement Agreement and WPA were executed.

40

[Citation.]  In support, Marina cites two cases for the proposition that the harm from a Government Code § 1090 violation occurs when the tainted contract is executed.  ([]; *Marin Healthcare* [*Dist. v. Sutter Health* (2002)] 103 Cal.App.4th [861] at [p.] 879; *Santa Clarita Org. for Planning and the Environment (SCOPE) v. Abercrombie* (2015) 240 Cal.App.4th 300, 310.) Marina produces Monterey's discovery responses to show that Monterey would have had to incur costs to mitigate any damages caused by the invalidity of the RDP Agreements.  [Citation.]  [¶] . . . [¶]

"Marina's evidence is sufficient to carry its initial burden of establishing that causation and harm occurred by April 6, 2010.  Focusing on the WPA because it was the principal agreement between the parties, the Government Code § 1090 violation was intractable on April 6, 2010.  Even if PUC approval would still have been necessary to ratify the WPA, the WPA, as executed by the parties, could not be ratified because Collins had participated in making the contract while he had an impermissible conflict of interest.  (See, e.g., *SCOPE*, 240 Cal.App.4th at [p.] 311.)  Accordingly, Monterey had suffered harm on April 6, 2010 because it had invested resources in obtaining a contract that was void.  [Citation.]

"Monterey counters that this does not suffice to satisfy Marina's initial burden because it does not establish the date that the project irrevocably collapsed and because this is not an action pursuant to Government Code § 1090.  [Citation.]  First, Marina's evidence is sufficient to require the inference that there was harm as of April 6, 2010.  While it may have remained possible that Monterey could have mitigated most of its damages by salvaging the project, there was appreciable and actual harm on April 6, 2010.  Second, the fact that this is not a direct Government Code § 1090 claim does not change the foregoing analysis."

41

This, we conclude, was wrong for several reasons.

To begin with, we do not understand how the court's final sentence can withstand the scrutiny required in a court's determination of a summary adjudication motion. It is the complaint that frames the motion, the complaint that must frame the analysis. How could the fact that the complaint was not based on a section 1090 claim not change the analysis?

We also do not understand the court's focus on the April 6 execution of what the court termed the "principal agreement," as the reality of the situation here involved a series of agreements—five to be exact—none of which was designated "principal." The court's focus also ignores the fact that two of the RDP Agreements, the Credit Line Agreement and Project Management Agreement, were not even executed until 2011. As the Court of Appeal described in *Cal-Am One*, it agreed "with the trial court that 'the contracts were not made in a day.' " (*Cal-Am One, supra*, 2 Cal.App.5th at p. 766.)

Moreover, the Settlement Agreement provided that "no Party assumes any liability under the Implementing Agreements solely by reason of such Party entering into the Implementing Agreements and this Settlement Agreement." The WPA was one of the Implementing Agreements.

In addition, the WPA provided that approval by the PUC was a condition precedent to it becoming effective. That did not happen until December 2010. And because the PUC approval was an express condition precedent to the agreements becoming effective, and the agreements expressly provided that no liability attached to any party's preliminary approval before final PUC approval was obtained, Monterey's preliminary approval of the agreements on April 6, 2010 was not a legally significant

42

event in terms of "investing resources" or sustaining "harm." The contracts were not in effect.

The trial court dismissed the importance of the condition precedent by stating, without citation to anything, the WPA "could not be ratified [by the PUC] because Collins had participated in making the contract while he had an impermissible conflict of interest." But no one knew in 2010 that Collins had violated section 1090. And the contracts were not actually declared void until years later—and then only after overcoming years of Marina's aggressive arguments that the contracts were *valid*. (*Cal-Am One, supra,* 2 Cal.App.5th at pp. 758–762.) The court's statement was also in disregard of the fact that Monterey did not know in April 2010 it had "invested resources in obtaining a contract that was void," because neither the WPA nor the Settlement Agreement had been approved by the PUC by that date. In dismissing the importance of the PUC's subsequent approval of the contracts, the trial court wrote they "could not be ratified" by the PUC because of Collins's conflict of interest. Certainly the PUC did not know it could not "ratify" the Settlement Agreement and WPA, because it did so on December 2, 2010. The Credit Line Agreement and Project Management Agreement were not approved until January 2011. And Collins's violation of section 1090 was not established until the Phase One trial in 2015. The trial court's conclusion is at odds with these facts.

The trial court's conclusion that Monterey suffered "harm" on April 6, 2010 because of its preliminary approval of two agreements that were expressly not in effect on that date is not supported by the record. But even if Monterey's preliminary approval of those agreements could be considered a type of "harm," there was no evidence in 2010 it had been caused by Marina's negligent supervision of anyone.

43

The trial court also violated the fundamental principle that it must liberally construe the evidence in favor of Monterey and resolve all doubts in its favor. (*Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 206; *Nazir*, *supra*, 178 Cal.App.4th at p. 254.) It did not, but simply dismissed Monterey's contrary evidence, writing this: "Monterey's evidence that there was ongoing uncertainty [in 2010] regarding whether the contracts were void as a result of the conflict and whether the project could be salvaged does not create a triable issue of fact as to the accrual of the harm . . . ."

The trial court cited deposition testimony from Monterey lawyers Dan Carroll and Kevin O'Brien about a telephone conversation they had with Collins on June 4, 2010, which call was in response to a vague message from Marina lawyer Fogelman that "Lloyd [Lowrey] began to wonder whether Steve Collins might face any [section] 1090 issues as a witness or otherwise."

Carrol and O'Brien took the initiative to inquire and arranged a telephone conference with Collins. As to it, O'Brien testified that Collins said he was "working as a sub for RMC" and helping with financing for the project. And, O'Brien added, "Collins didn't tell us very much about the nature of the relationship with RMC. In fact, he was pretty vague," and concluded "[w]e don't know if there had been a [section] 1090 violation." The call left O'Brien wondering whether Collins "had some financial interest in the project that *might or might not* be a [section] 1090 violation," adding that he "thought it was a serious issue as to *whether* there was a [section] 1090 violation." O'Brien also testified that the "key question, which was still unanswered, . . . what was this relationship? And that was very fuzzy as a result of the call." And he added, "we tried to understand what was going on here. And all we really were told was that, 'I'm helping with the financing.'" Finally, Carroll testified he thought Collins's "work" for RMC consisted in

44

doing "some consulting with Lyndel [Melton]," and, indeed, was not sure Collins was actually working for RMC.

The most that can be said of this testimony is that it was inconclusive as to whether Collins had a conflict. Neither Carroll nor O'Brien came away from their conversation with Collins with an understanding that he had violated section 1090. Significantly, there was no mention, at all, of Marina or of any fact that would have put Carroll or O'Brien on notice of a relationship between Collins and Marina.

Despite all that, the court dismissed the conflicts in the evidence in two footnotes, footnotes Monterey describes as "stunning." These are those footnotes:

(1) "Monterey's evidence that there was ongoing uncertainty regarding whether the contracts were void as a result of the conflict and whether the project could be salvaged does not create a triable issue of fact as to the accrual of the harm. [Citation.]"

(2) "Monterey also argues that there are inconsistencies within the deposition testimony supplied by Marina that show material factual disputes. [Citation.] As discussed in the previous section, the deposition testimony supplied by Marina is susceptible to only one legitimate inference. To the extent there are inconsistencies on particulars, those particulars are immaterial."

The trial court was obligated to resolve the inferences in favor of Monterey, but did not. It should not have relied on ambiguous evidence, but did. It should not have imputed to Monterey, in 2010, knowledge of facts that were not established until 2015. And it should not have attributed the assumed "harm" from Collins's as-yet unestablished violation of section 1090 to a tort claim against Marina that Monterey did not know it had.

45

Regardless, whether Carroll and O'Brien believed Collins was violating section 1090 in June 2010 is not the issue. The issue was tortious conduct by Marina, and there was no reason to suspect that in 2010 Monterey had knowledge that Marina had retained Collins and failed to supervise him—no notice of any cause of action.

After holding that Monterey had been "harmed" by its approval of contracts, the court wrote, it "*may* have remained *possible* that Monterey *could* have mitigated *most* of its damages." "May," "possible," "could," and "most" are hardly words one would expect in granting summary adjudication—not to mention words that reveal the speculative and unsupported nature of the court's conclusion. And the "harm" the court concluded that flowed from the as-then unproved violation of section 1090 flies in the face of the Supreme Court's admonition that "The mere breach of . . . duty, causing only nominal damages, speculative harm, *or the threat of future harm—not yet realized*—does not suffice to create a cause of action for negligence." (*Budd v. Nixen* (1971) 6 Cal.3d 195, 200, italics added, superseded by statute on other grounds as stated in *Adams v. Paul* (1995) 11 Cal.4th 583, 588–589 & fn. 2; see also, *Davies v. Krasna* (1975) 14 Cal.3d 502, 514.)

No "actual harm" had been inflicted on Monterey in April 2010. Not only was Collins's violation of section 1090 not proven until the Phase One trial, the parties continued to proceed with the project after June 2010, which included the 2011 approval of the Credit Line Agreement and Project Management Agreement, and Marina (and RMC) publicly distributing announcements of the project's continuing viability and progress into 2012.[12]

---

[12] Illustrations of such announcements include these:

The court's conclusion there was "harm as of April 6, 2010" is wrong for another reason—the court misapplied the concept of void ab initio. The RDP Agreements had not been adjudicated void in 2010, only when the superior court rendered its Phase One statement of decision in April 2015. And no one knew in April 2010 that the contracts would be declared void five years later. No authority supports such a retroactive application of void ab initio to extinguish a cause of action without notice. And no authority suggests the finding that a contract is void ab initio can be wielded offensively to extinguish independent torts outside the contractual relationship in question.

According to the trial court's analysis, the two-year statute of limitations on Monterey's tort claim expired before the RDP Agreements were declared void. The court interpreted the 2015 adjudications of Collins's section 1090 violation to mean the contracts were actually void in 2010. But the court took it a step further and held that Monterey was harmed in 2010 by a future determination of voidness made years later—a determination, we hasten to repeat, made over Marina's vigorous opposition.

Not only did the court misapply the concept of void ab initio, its conclusion eliminated the concept of notice. A plaintiff has to know about a cause of action before it can accrue. (*Jolly v. Eli Lilly & Co.* (1988) 44 Cal.3d 1103, 1110.) In 2010, Monterey did not know Collins was violating section 1090; did not know Marina had orchestrated Collins's retention to work on the project; did not know Marina had negligently supervised Collins; and did

- July 1, 2011: Marina will "[p]roceed with the [RDP]" and "[w]ork with its [RDP] partners to ensure that the project  moves forward";
- December 6, 2011: RMC is "still on board" and Monterey may "revote on the agreements";
- January 12, 2012: "work was still going on on the project" and RMC was still getting paid.

47

not know Collins had been allowed to work outside the scope of his intended assignment.  Monterey did not discover what Marina had done until Heitzman testified in November 2014 that, despite Collins's assignment had been limited, he had been allowed to perform unauthorized work—"scope creep," he called it—outside that limited assignment.

In light of all this, just what causes of action was Monterey to allege in early 2010?  And how it would play out alongside Phase One—and Marina's vigorous position that the agreements were not void?  Finally, given Marina's apparently litigious nature, what would have happened if Marina had in fact filed a lawsuit and then Marina succeeded in Phase One and the contracts were upheld?  A malicious prosecution claim perhaps?  Another observation in *Fox* is apt: "It would be contrary to public policy to require plaintiffs to file a lawsuit 'at a time when the evidence available to them failed to indicate a cause of action.' (*Leaf v. City of San Mateo* (1980) 104 Cal.App.3d 398, 408; see also *Enfield v. Hunt* (1979) 91 Cal.App.3d 417, 424.)  Were plaintiffs required to file all causes of action when one cause of action accrued, as they would be under the *Bristol-Myers Squibb* [*Co. v. Superior Court* (1995) 32 Cal.App.4th 959] rule, they would run the risk of sanctions for filing a cause of action without any factual support.  (Code Civ. Proc., § 128.5; see *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 14 [holding lack of factual basis for claim to be grounds for imposing sanctions].)  Indeed, it would be difficult to describe a cause of action filed by a plaintiff, before that plaintiff reasonable suspects that the cause of action is a meritorious one, as anything but frivolous." (*Fox*, *supra*, 35 Cal.4th at p. 815.)

## DISPOSITION

The judgment is reversed and the matter is remanded with instructions to the trial court to vacate the orders dated February 22, 2019 and June 20,

2019 granting the motions for summary adjudication and to enter new orders denying the motions.  Monterey and Cal-Am shall recover their costs on appeal.

_____
Richman, J.

We concur:

_____
Stewart, P.J.


_____
Miller, J.

*California-American Water Company et al. v. Marina Coast Water District* (A160662)

| | |
|---|---|
| Trial Court: | San Francisco County Superior Court |
| Trial Judge: | Honorable Anne-Christine Massullo |
| Attorney for Plaintiff and Appellant, California American Water Company: | Allen Matkins Leck Gamble Mallory & Natsis, LLP, Robert R. Moore, Michael J. Betz, Alexander J. Doherty |
| Attorney for Plaintiff and Appellant, Monterey County Water Resources Agency | Law Offices of Mark A. Wasser, Mark A. Wasser; County of Monterey, Leslie J. Girard, County Counsel, Kelly L. Donlon, Deputy County Counsel |
| Attorney for Defendant and Respondent, Marina Coast Water District | Richards, Watson & Gershon, Saskia T. Asamura, T. Peter Pierce, Kyle H. Brochard; Friedman & Springwater LLP, Ruth Muzzin |